IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| VIRNA M. DANIELS, | * | |
| Plaintiff, | * | |
| | * | |
| | * | |
| v. | * | Civil Action No. 11-cv-02938-AW |
| | * | |
| HOUSING AUTHORITY OF PRINCE | * | |
| GEORGE'S COUNTY, *et al.*, | * | |
| Defendants. | * | |

*****************************************************************************

## MEMORANDUM OPINION

On October 14, 2011, Plaintiff brought suit against Defendants pursuant to 42 U.S.C. § 1983 for alleged deprivations of her rights under the Fourteenth Amendment Due Process Clause and the Housing Choice Voucher Program, 42 U.S.C. § 1437f.  A bench trial was held on March 4 and March 7, 2013.  The Court has carefully considered the parties' exhibits, the testimony of the witnesses, the pretrial submissions and post-trial briefs, and the oral arguments of counsel.  The following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons articulated below, the Court will enter judgment in favor of Defendants on Counts IV and V and in favor of Plaintiff on Count VI.  The Court will award Plaintiff $24.00 in damages on Count VI and $1.00 in nominal damages for Defendants' liability on Count I.

## I.  BACKGROUND

The Housing Choice Voucher Program ("HCVP"), also known as Section 8, is a federal program created to help low-income families obtain affordable housing.  *See* 42 U.S.C. § 1437f. Defendants Housing Authority of Prince George's County ("HAPGC") and Eric C. Brown, in his

official capacity as Executive Director of HAPGC, administer the program for Prince George's

County.  Plaintiff Virna Daniels, a participant in the HCVP homeownership program, alleged six

counts against Defendants in her Amended Complaint, all of which were brought pursuant to 42

U.S.C. § 1983.  *See* Doc. No. 24.  In Count I, Plaintiff alleged that Defendants deprived her of

her constitutional rights under the Due Process Clause of the Fourteenth Amendment by failing

to provide her with an informal hearing to challenge the alleged underpayment of her housing

subsidy in 2010.  Similarly, in Count II, Plaintiff alleged that Defendants deprived her of her

federal right under Section 8 and regulations implemented by the Department of Housing and

Urban Development (HUD) by failing to provide her with an informal hearing to challenge the

alleged 2010 underpayment.

  In Counts III, IV, V, and VI, Plaintiff alleged that Defendants deprived her of her federal

right to a properly calculated housing subsidy under Section 8 and implementing HUD

regulations.  Specifically, Plaintiff alleged that Defendants failed to timely process her monthly

payment for August 2010, which resulted in a prorated subsidy that month (Count III);

erroneously used her son's 2009 income as a basis for her anticipated household income for

2010, thereby reducing her monthly subsidy payments from August 2010 through December

2010 (Count IV); failed to timely remove her son from the household in December 2010, thereby

reducing her subsidy payment in December 2010 (Count V); and failed to properly credit her for

all her medical expenses, thereby reducing her monthly subsidy payments from May 2011

through the present (Count VI).

  On August 24, 2012, Plaintiff filed a Motion for Partial Summary Judgment as to liability

on Counts I, IV, V, and VI.  Doc. No. 28.  The Court held a hearing on Plaintiff's Motion on

November 16, 2012.  Doc. No. 33.  With respect to Count I, it was not disputed that Plaintiff

requested an informal hearing to challenge Defendants' calculation of her subsidy on August 16, 2010, and that her attorney reiterated that request on multiple occasions in the months that followed.  In their opposition brief, Defendants attempted to characterize August 12, 2010 and December 21, 2010 meetings between Defendants and Plaintiff and her counsel as "informal hearings."  However, during the November 16 hearing, counsel for Defendants presented nothing convincing to challenge Plaintiff's argument that informal hearings in accordance with the HAPGC Administrative Plan were never held.  Accordingly, the Court held that Defendants were liable on Count I:

> In denying Daniels an informal hearing, Defendants failed to comply with the due process requirements of *Goldberg v. Kelly*, 397 U.S. 254, 266–71 (1970), applicable HUD regulations, *e.g.*, 24 C.F.R. § 982.555, and corresponding provisions of the governing Administrative Plan, *see* Doc. No. 30-1 at 16-14–16-22.  Accordingly, the Court finds that Defendants are liable under 42 U.S.C. § 1983 for violating Plaintiff's procedural due process rights.

Doc. No. 34 at 2.  The Court also dismissed Count II without prejudice when counsel for Plaintiff acknowledged that it was duplicative of Count I, and denied Plaintiff's Motion with respect to Counts IV, V, and VI.  *Id.* at 1–2.  A bench trial was scheduled to determine damages on Count I and liability and damages on Counts III, IV, V, and VI.  *Id.* at 3.

The bench trial was held on March 4 and March 7, 2013.  At the close of Plaintiff's case, Defendants moved for judgment on all Counts.  The Court entered judgment in favor of Defendants on Count III pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, but denied Defendants' Motion with respect to the remaining Counts.  The Court made the following findings of fact with respect to Count III: (1) Plaintiff's realtor, Joan Singh, sent communications to Defendants in June 2010 informing them that the closing on Plaintiff's home was scheduled for June 25, 2010; (2) The Housing Quality Standards (HQS) inspection of Plaintiff's home was not scheduled until after the closing; (3) The first HQS inspection, which Plaintiff's home failed,

occurred on July 21, 2010; (4) A second HQS inspection was scheduled for August 4, 2010, at which time Plaintiff's home passed inspection; and (5) Plaintiff's subsidy payment was prorated for the month of August 2010 on the grounds that her home did not pass inspection until August 4, 2010.

Under HUD regulations, a prerequisite for receiving a subsidy under the Section 8 program is that the participant's home pass HQS inspection.  24 C.F.R. § 982.628(a)(4). Accordingly, Defendants were not authorized by federal law to pay Daniels a subsidy until August 4, 2010.  Neither § 1437f nor the HUD regulations cited by Plaintiff provided her with a right to have an inspection prior to her closing date or a right to an immediate inspection. Furthermore, the Court could not conclude that the passage of two weeks between inspections was due to Defendants' misconduct or was otherwise unreasonable.  Accordingly, Plaintiff failed to show that she was deprived of a federal right, and Count III was dismissed.

The following findings of fact and conclusions of law are made with respect to the remaining claims in this case: liability and damages on Counts IV, V, and VI, and damages on Count I.

## II.     FINDINGS OF FACT

By letter dated April 13, 2010, the Maryland Department of Housing and Community Development informed Plaintiff Virna Daniels that she had pre-qualified to purchase a home under the Homeownership for Individuals with Disabilities Program.  The April 13 correspondence indicated that the prequalification was based on Daniels's receipt of a Housing Choice Voucher subsidy from Defendant HAPGC in an estimated amount of $1,433.92.  On May 7, 2010, Daniels signed a contract to purchase the property located at 13100 Glasgow Way, Fort Washington, Prince George's County.  The contract was ratified on May 10, 2010, and the

projected settlement date for the property was June 25, 2010.  Prior to the settlement date,

Carolyn Floyd, homeownership specialist for HAPGC, contacted Daniels to set up an

appointment to certify her participation in the Section 8 Program, administered by Defendants in

Prince George's County.  The parties stipulated that since certification, Floyd acted according to

HAPGC practice and policy in verifying Daniels's income and expenses and calculating her

housing subsidy.

　　　At all relevant times, Defendants were required to calculate Section 8 participants'

assistance payments in accordance with the terms of the governing Administrative Plan adopted

by HAPGC.  Chapter 6 of the Plan provided the policies and methods that HAPGC was required

to use to ensure that only eligible families received housing assistance and that no family paid

more or less than its obligation under HUD regulations.  That chapter specified the sources of

income to include and exclude in computing a family's annual income, how to subtract

deductions such as medical expenses to arrive at adjusted income, and the methodology for

calculating the family's monthly assistance payment.  Chapter 7 of the Plan governed

Defendants' methodology for verification of the participating family's information, including

income, household composition, and medical expenses.  Several provisions of the Plan quoted,

cited, or otherwise expressly relied upon the terms of administrative regulations and guidance

documents promulgated by HUD.  These and other relevant provisions of the Administrative

Plan will be discussed in substantial detail in the Court's Conclusions of Law.

　　　Daniels met with Floyd at HAPGC on June 23, 2010 for her certification appointment.

Daniels provided several documents relating to the income earned by her son, Dahvae Akers,

who was self-employed as a newspaper carrier.  Akers's income was relevant to calculating

Daniels's subsidy because he resided with his mother, and Section 8 participants' subsidy

calculations are based on the income earned by all members of the household.  At the June 23

meeting, Daniels submitted Akers's 2009 income tax return, which indicated that his gross

income for 2009 was $37,986 and his adjusted gross income for 2009 was $20,365.  Daniels also

provided an undated document from Akers's accountant, Liberty Tax Service ("LTS"), which

projected Akers's gross income for 2010 to be $35,592 and his net income for 2010 to be $9,492.

Floyd received other materials from Daniels at the June 23 meeting, including receipts and other

documents purportedly reflecting Akers's business expenses.

At the June 23 meeting, Floyd briefly reviewed the documents provided by Daniels,

including the LTS projection, and estimated that Daniels's monthly subsidy would be $1,306.50.

Floyd explained to Daniels that she needed additional time to review the documents in greater

detail and that the figure was only an estimate.  Daniels signed her initials next to the

"ESTIMATE" heading of the HAP Calculations document and next to the projected HAP

payment amount.  Daniels and Akers both signed consents to the release of information to

HAPGC on June 23.

At some point in July 2010, Floyd closely examined the documents submitted by Daniels

and determined that her monthly subsidy would be $1,045.  Floyd relied on Akers's 2009 tax

return to make this calculation.  Floyd declined to use the LTS projection because she believed

the 2009 tax return was more reliable and that its use was in accordance with the Administrative

Plan.  Floyd also declined to use the other documents evidencing business expenses because

many were illegible and could not be verified.  Floyd did not request additional information from

Daniels to determine the subsidy, did not contact the newspaper company that contracted with

Akers, and did not provide forms to Akers for the reporting of his business expenses.

Furthermore, Floyd did not rely on current circumstances in projecting Daniels's household

income, and she did not document in Daniels's participant file her reasons for departing from current circumstances.

Daniels's home passed HQS inspection on August 4, 2010, and she began receiving her monthly assistance payment as of that date.  On August 12, 2010, HAPGC sent a letter to Daniels informing her that her monthly assistance payment would be $1,045.  Her initial payment for August 2010 was prorated at $975 because her home did not pass HQS inspection until August 4.  Around this time, Daniels went to HAPGC to retrieve her first subsidy check.  Daniels was shocked and became extremely upset upon discovering the amount of her monthly assistance payment.  Daniels met with Floyd and Floyd's supervisor, Program Manager Mavis Headley, to review the calculations.  Floyd and Headley explained the basis for the $1,045 amount, and Floyd reminded Daniels that the figure provided by HAPGC in June was merely an estimate.  Daniels remained visibly upset throughout the meeting.

In early September 2010, Daniels retained an attorney, Hong Park, to assist her with her housing subsidy.  Park reviewed Daniels's documentation and initially contacted HAPGC in September to try to set up a meeting.  Park's first meeting with Floyd occurred on October 12, 2010, when they discussed the calculation of Daniels's subsidy and why it was prorated in August.  He asked Floyd for a copy of the Administrative Plan, which she said she would provide.  Park also informed Floyd that he would be providing documents detailing Akers's business income and expenses.

At some point in September 2010, Akers left Daniels's home in Prince George's County and moved in with his uncle in Washington, D.C.  On or about October 1, 2010, Akers filled out an "Official Mail Forwarding Change of Address Order" with the United States Postal Service (USPS).  Daniels subsequently informed Park that her son had moved out of the home.

On November 17, 2010, Park went to HAPGC and had a brief meeting with Floyd. Floyd informed Park that she did not have the copy of the Administrative Plan that he had requested.  Park, in turn, told Floyd that Akers had left Daniels's household.   Floyd explained to Park that Daniels would have to inform HAPGC in writing as to the change in household composition.  On November 18, 2010, Park e-mailed Floyd to inform her in writing that Akers no longer resided with Daniels and that he was living with his uncle in Washington, D.C. on a permanent basis.  He requested that Akers's income be removed from Daniels's household effective December 2010.  Park also told Floyd, "I can provide affidavits stating that [Akers] resides with his uncle when I meet with you on November 30th."  Floyd did not respond to Park's e-mail or otherwise inform him in November that affidavits would not be sufficient.

As part of his November 18 e-mail to Floyd, Park also asserted that Defendants had miscalculated Daniels's subsidy by failing to properly account for her son's business expenses. Park attached a spreadsheet to explain the methodology behind his own calculations.  The spreadsheet included a mileage ledger for Akers's vehicle use, including a determination that 72.55% of the mileage was for business purposes.  The spreadsheet also included business expenses for vehicle parts and service, gas, AAA membership, note payments, insurance, payment for hired help, cell phone usage, and supplies.  Park estimated that Akers's 2010 gross business income would be $39,833.87, that his 2010 net business income would be $16,418.74 based on business expenses, and that his 2010 net income after turning 18 would be $10,945.83. Park also attached to his November 18 e-mail a large number of receipts which reflected expenses for car payments, car service and parts, cell phone bills, gas, food, and purchases at various retail stores.  Park noted in his spreadsheet that some of the receipts for food, supplies, and gas were not used in his analysis.  Park's purpose in providing the spreadsheet was to help

Floyd and Defendants understand the supporting documentation being submitted, to provide a clear summary, to aid negotiations with Defendants, and to convince them to increase her monthly subsidy payment.  It is not disputed, however, that Park's methodology in singling out Akers's income after turning 18 was incorrect under the regulations and Administrative Plan.

Floyd subsequently reviewed the documents submitted by Park.  She concluded that several of the documents could not be verified as business expenses under the Administrative Plan and that there were errors in Park's calculations.  Some of the receipts submitted were also illegible and several were in Daniels's name, not Akers's.  Defendants therefore continued to rely on the 2009 tax return in calculating Daniels's subsidy.

Park had a meeting set up with Floyd on November 30, 2010 to discuss the documents he submitted on November 18 as well as the change in Daniels's household composition.  Floyd cancelled the meeting that morning, however, because her supervisors were unavailable.  The same day, Park e-mailed Floyd and attached affidavits from Daniels, Akers, and Akers's uncle stating that Akers had left Daniels's household and was residing with his uncle in Washington.  On December 3, 2010, Floyd sent a letter to Daniels stating that HAPGC was unable to process her request for a change in household composition because it required the following additional information: "Legal proof of [Akers's] new residence (ex: new picture id, lease, utility bill, bank statement, and/or change of address card)."  In response to this letter, Park e-mailed Floyd on December 15, 2010 and attached a copy of Akers's Washington, D.C. identification card and a change-of-address confirmation letter from USPS.  Park eventually met with Floyd and Headley at HAPGC on December 21, 2010 to discuss the spreadsheets submitted by Park.  Floyd and Headley told him that they would take his proposed calculations under advisement.

On January 6, 2011, HAPGC informed Daniels that Akers had been removed from her household composition.  The removal of Akers from Daniels's household composition was effective January 1, 2011, and resulted in an increase in Daniels's monthly subsidy payment to $1,554.  Headley also informed Park by letter dated January 10, 2011 that HAPGC fully assessed the concerns he expressed at the December 21, 2010 meeting but remained confident that Daniels was receiving all the benefits to which she was entitled.  Headley's January 10 letter stated, "[t]he calculations performed reflect the accurate payment standard in effect at the time [Daniels's] subsidy began and also reflect the best projection of Akers' annual income based on the information presented at the time the calculations were performed."

In the months that followed, Daniels and Defendants also disagreed as to the amount of Daniels's medical expenses, which are deductible expenses for the purpose of calculating Section 8 participants' adjusted income and monthly assistance payments.  Daniels suffers from a severe crossbite and malalignment of her jaw and temporomandibular joint.  In April 2011, Defendants sent Daniels a letter for the annual recertification of her subsidy.  On April 27, 2011, Daniels submitted documents to Floyd concerning medical treatment and related expenses. These documents included: (1) an April 19, 2011 Statement of Account for dental work from Dr. Cohen, which reflected $270 in payments by Daniels on March 3 and April 19, 2011, with a balance of $100 due to Dr. Cohen; (2) an April 19, 2011 Estimated Treatment Plan from Dr. Cohen; and (3) Financial Options documents from Drs. Burk and Flinn, also dated April 19, 2011.  Defendants also acknowledged receiving during this time period a letter from Dr. Nicholas Mehta dated May 4, 2011, which described Daniels's condition and stated that she was currently undergoing dental treatment.

The Estimated Treatment Plan from Dr. Cohen estimated $366 in fees for proposed dental work, but contained no indication that Daniels had agreed to the proposed treatment or had undertaken a financial obligation with respect to such treatment.  The Financial Options documents detailed two dental and orthodontic treatment plans totaling $5,382 and $6,327, respectively, for an estimated 20–22 months of treatment.  Each Financial Option provided an interest-free office plan, as well as a flexible payment plan through Care Credit for as low as $125/month.  As with the Estimated Treatment Plan, the Financial Options documents gave no indication that Daniels had agreed to treatment from Drs. Burk and Flinn or had undertaken any financial obligations with respect to such treatment.

In computing Daniels's medical expenses at her annual recertification, which was effective August 2011, Floyd gave Daniels credit for $370 based on the statement from Dr. Cohen ($270 in payments plus the $100 remaining balance).  Floyd did not give credit to Daniels based on the Estimated Treatment Plan from Dr. Cohen or the Financial Options documents from Drs. Burk and Flinn because the documents gave no explicit indication that Daniels would be responsible for ongoing expenses in the future.  Although Floyd had authorization from Daniels to contact medical providers to verify information, Floyd did not contact any of her medical providers to discuss potential future treatment and future expenses.  Accordingly, effective August 2011, Defendants were crediting Daniels with $370 in total medical expenses for the purpose of calculating her housing subsidy.

Several weeks later, on October 10, 2011, Park e-mailed Floyd to request a recalculation of Daniels's subsidy based on her medical expenses.  Park reported that Daniels was spending approximately $230/month for dental work.  The next day, Floyd responded to Park's e-mail and requested supporting documentation of her paid medical costs.  On October 19, 2011, Park

submitted invoices from Dr. Cohen establishing that Daniels had made payments totaling $445 between March 3 and September 7, 2011 (amounting to $55.63/month) and had a remaining balance of $91 balance with Dr. Cohen.  Floyd had already credited Daniels with $370 of the $445 in paid expenses (a difference of $75) effective August 2011.  Park also informed Floyd that Daniels would be receiving ongoing treatment from Dr. Cohen.

Park explained in his October 19 e-mail that Daniels paid for separate orthodontic services through her Care Credit card.  Park further noted that Care Credit cards are used exclusively for healthcare services, and attached a Care Credit User Guide in support.  The User Guide also stated that Care Credit cards could be used for family members and pets.  Park provided an invoice from Care Credit showing that Daniels had a balance of $6,523.43 which required a minimum monthly payment of $179, and a printout of Daniels's Care Credit payment history showing that she had met the minimum monthly payment since July 2011.  The payment history also showed that Daniels had made Care Credit payments totaling $845 since May 2, 2011.  Park's e-mail informed Floyd that Daniels planned to make the minimum monthly payment going forward.  Park's October 19 e-mails also attached the same documents that Daniels had submitted on April 27, 2011.  Park requested that Defendants provide Daniels with retroactive benefits to April 2011, when she first submitted the medical documentation in support of her recertification.

Floyd reviewed the documents submitted by Park and adjusted Daniels's income effective November 2011 based on Care Credit payments of $845.  Defendants did not give any credit to Daniels for the additional $75 in past payments to Dr. Cohen, the $91 balance with Dr. Cohen, or claimed ongoing payments to Care Credit for treatment from Drs. Burk and Flinn. Floyd also determined that retroactive payments dating back to April 2011 were not warranted.

Effective November 2011, Defendants were crediting Daniels with $1,215 in total medical expenses. This was the result of adding $845 in Care Credit payments to the $370 in credit Daniels had been receiving since August 2011 for expenses paid to Dr. Cohen. Daniels continued to receive credit for $1,215 in medical expenses through April 2012.

In January and February 2012, Park communicated to Floyd that he disagreed with Defendants' calculations of Daniels's medical expenses. Floyd informed him that Defendants had properly accounted for her medical expenses, and no additional modifications would be made. On February 29, 2012, Daniels requested an informal hearing with HAPGC to contest Defendants' calculation of her medical expenses. Defendants scheduled the hearing for April 3, 2012.

In preparation for the informal hearing, Park e-mailed counsel for Defendants on March 30 and April 2, 2012 and attached updated medical documentation for Daniels. The documentation included additional invoices from Dr. Cohen and Care Credit payment information. The informal hearing was held April 3, 2012. Park presented charts explaining what he believed demonstrated the proper calculation of Daniels's medical deductions since May 2011. Following the hearing, Park submitted revised charts to counsel for Defendants, as well as additional documentation showing Daniels's Care Credit expenses.

On April 16, 2012, Defendants issued their decision in response to the April 3 informal hearing. Defendants affirmed their determinations that were made effective August 2011 (which accounted for $370 in expenses with Dr. Cohen) and November 2011 (which accounted for the additional $845 in Care Credit expenses). Effective May 1, 2012, and based on the documentation submitted by Park in late March and early April 2012, Defendants concluded that Daniels was entitled to credit for an additional $1,160 based on additional payments to Dr.

Cohen and Care Credit expenses, which brought her total medical expenses to $2,375. Defendants accounted for—as part of this $1,160—the $75 in payments to Dr. Cohen dated June 9 and September 7, 2011, documents Park had originally submitted in October 2011. Defendants also accounted for $100 in payments to Dr. Cohen made on March 12 and April 2, 2012. Defendants refused to process retroactive adjustments for Daniels, however, finding that the documentation of $1,160 in additional paid expenses was not available to Defendants until March 30, April 2, and April 3, 2012.

As a result of Defendants' alleged miscalculations of her housing subsidy, Daniels testified that she suffered stress, sleepless nights, headaches, and general mental anguish. She suffered anxiety as a result of not having sufficient funds to provide for her family and because she was forced to reach out to family members to help ends meet. She also suffered anxiety because Defendants' actions caused strain on her family members and family relationships.

## III.   CONCLUSIONS OF LAW

Plaintiff claims that Defendants are liable pursuant to 42 U.S.C. § 1983 for violating her federal rights under the Fourteenth Amendment and the Homeownership Option of the Housing Choice Voucher Program. On Count I, the Court has already concluded that Defendants deprived Plaintiff of her procedural due process rights by failing to afford her an informal hearing to challenge the calculation of her monthly assistance payment. The remaining issue on Count I is whether Plaintiff is entitled to compensatory damages. In Counts IV, V, and VI, Plaintiff claims Defendants violated her federal right to a statutorily determined monthly assistance payment pursuant to 42 U.S.C. § 1437f(y), implementing HUD regulations, and provisions of the governing Administrative Plan. The Court's analysis will begin with an assessment of Defendants' liability on Counts IV, V, and VI.

A.      Claims based upon alleged violations of 42 U.S.C. § 1437f(y)

1.      Enforcement of the Homeownership Option under § 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Pursuant to § 1983, private individuals may bring lawsuits to enforce rights created by federal statutes in addition to those arising under the Constitution. *Maine v. Thiboutot*, 448 U.S. 1, 4–5 (1980).

As the Court previously determined, Daniels has a federal right to a properly calculated housing subsidy under 42 U.S.C. § 1437f(y), and her causes of action are properly brought pursuant to § 1983.  Doc. No. 18 (citing *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418 (1987); *Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356 (5th Cir. 2006)).  Defendants admitted in their Answer to the Amended Complaint that Plaintiff's causes of action are properly brought under 42 U.S.C. § 1983.  Doc. No. 26 ¶¶ 29, 32, 38 (admitting with respect to Counts IV, V, and VI that Plaintiff had a right to properly calculated subsidy under § 1437f, HUD regulations, and the Administrative Plan).

The *Wright* and *Johnson* courts held that public housing tenants and Section 8 tenants, respectively, could bring suit pursuant to § 1983 to challenge local housing authorities' calculations of their utility allowances under the Housing Act and implementing regulations. However, Plaintiff's claim in this case—that she is entitled to a properly calculated subsidy under the Homeownership Option of the Housing Choice Voucher Program, specifically, § 1437f(y)—presents a matter of first impression.  There is no dispute in this case that Plaintiff may enforce this federal right pursuant to § 1983, but a thorough analysis of the Homeownership

Option provision, implementing regulations, and the courts' decisions in *Wright* and *Johnson* will help define the contours of Plaintiff's asserted federal right and aid the Court's analysis of her claims.

In 1974, Congress amended the Housing Act of 1937 by establishing the Housing Choice Voucher Program (Section 8) "for the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." Housing and Community Development Act of 1974, Pub. L. No. 93-383, tit. II, § 8, 88 Stat. 833. In 1992, Congress amended Section 8 by establishing the Homeownership Option, which provides that a family receiving tenant-based assistance under the Section 8 program may also receive assistance for occupancy of a dwelling owned by one or more members of the family. Housing and Community Development Act of 1992, Pub. L. No. 102-550, tit. I, § 185, 106 Stat. 3672 (codified as amended 42 U.S.C. § 1437f(y)). Congress subsequently amended the Homeownership Option of Section 8 in the Quality Housing and Work Responsibility Act of 1998. Pub. L. No. 105-276, tit. V, § 555, 112 Stat. 2461. The following provision dictates the amount of assistance received by participants in Section 8's Homeownership Option:

(A) Monthly expenses not exceeding payment standard

If the monthly homeownership expenses, as determined in accordance with requirements established by the Secretary, do not exceed the payment standard, the monthly assistance payment shall be the amount by which the homeownership expenses exceed the highest of the following amounts, rounded to the nearest dollar:

(i) 30 percent of the monthly adjusted income of the family.

(ii) 10 percent of the monthly income of the family.

(iii) If the family is receiving payments for welfare assistance from a public agency, and a portion of those payments, adjusted in accordance with the actual housing costs of the family, is specifically designated by

16

that agency to meet the housing costs of the family, the portion of those
payments that is so designated.

(B) Monthly expenses exceed payment standard

If the monthly homeownership expenses, as determined in accordance with
requirements established by the Secretary, exceed the payment standard, the
monthly assistance payment shall be the amount by which the applicable payment
standard exceeds the highest of the amounts under clauses (i), (ii), and (iii) of
subparagraph (A).

42 U.S.C. § 1437f(y)(2).

The relevant point of the statute for the purposes of this case is that Section 8 requires

housing subsidies to be calculated based upon the adjusted income of the participating family.

The term "income" used for the calculation of the monthly assistance payment means income

from all sources of each member of the household, but excludes "any amounts not actually

received by the family." *Id.* § 1437a(b)(4).  The term "adjusted income" means, "with respect to

a family, the amount (as determined by the public housing agency) of the income of the members

of the family residing in a dwelling unit" following certain income exclusions. *Id.* § 1437a(b)(5).

For example, the public housing agency ("PHA") is required to exclude from a family's annual

income the portion of medical expenses exceeding 3% of the annual family income. *Id.*

§ 1437a(b)(5)(A)(ii).  HUD regulations require each PHA to adopt a written administrative plan

that establishes local policies for administration of the Program on matters for which the PHA

has discretion.  24 C.F.R. § 982.54(a).  The PHA must administer the Program in accordance

with the adopted administrative plan. *Id.* § 982.54(c).

In *Wright*, plaintiffs were tenants in low-income housing projects owned by the defendant

public housing agency.  479 U.S. at 419.  The tenants sued the PHA under § 1983 for allegedly

overcharging them for their utilities and thereby violating the statutory rent ceiling that limited

their rent to 30 percent of their adjusted monthly income. *Id.* at 420–21.  The statutory language

17

at issue in *Wright* was the Brooke Amendment, which stated that a low-income family "shall pay

as rent . . . 30 per centum of the family's monthly adjusted income." *Id.* at 420 n.2 (quoting 42

U.S.C. § 1437a(a)(1)(A)).  The Court found that in implementing the statute, HUD "consistently

considered 'rent' to include a reasonable amount for the use of utilities, which is defined by

regulation as that amount equal to or less than an amount determined by the PHA to be a

reasonable part of the rent paid by low-income tenants." *Id.* at 420 (citing HUD regulations in

effect at the time of filing).

 The Court held that "nothing in the Housing Act or the Brooke Amendment evidences

that Congress intended to preclude petitioners' § 1983 claim." *Id.* at 429.  Of particular

relevance to the instant case, the Court in *Wright* rejected respondent's argument that the Brooke

Amendment and HUD regulations did not give tenants a specific or definable right to utilities,

that is, an enforceable right under § 1983:

> The Brooke Amendment could not be clearer: as further amended in 1981, tenants
> could be charged as rent no more and no less than 30 percent of their income.
> This was a mandatory limitation focusing on the individual family and its income.
> The intent to benefit tenants is undeniable.  Nor is there any question that HUD
> interim regulations, in effect when this suit began, expressly required that a
> "reasonable" amount for utilities be included in rent that a PHA was allowed to
> charge, an interpretation to which HUD has adhered both before and after the
> adoption of the Brooke Amendment.

*Id.* at 430.  The Court noted that "it is clear to us that the regulations gave low-income tenants an

enforceable right to a reasonable utility allowance and that the regulations were fully authorized

by the statute." *Id.* at 420 n.3.  It further concluded that the benefits Congress intended to confer

on tenants were "sufficiently specific and definite" such that they were not "beyond the

competence of the judiciary to enforce." *Id.* at 432.

 The Supreme Court's approach to § 1983 enforcement actions has been increasingly

restrictive in recent years. *Johnson*, 442 F.3d at 360.  However, *Wright* remains good law after

18

*Gonzaga University v. Doe*, in which the Supreme Court held that the nondisclosure provisions of the Family Educational Rights and Privacy Act (FERPA) did not create a personally enforceable right under § 1983.  536 U.S. 273 (2002).  In *Gonzaga*, the Court noted that since its decision in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), it had only twice found spending legislation to give rise to enforceable rights.  536 U.S. at 280.  One such case was *Wright*, which was decided "on the ground that the provision unambiguously conferred a mandatory benefit focusing on the individual family and its income."  *Id.* (quoting *Wright*, 479 U.S. at 430) (internal quotations omitted).  The Court in *Gonzaga* held that "the key to [the Court's] inquiry [in *Wright*] was that Congress spoke in terms that 'could not be clearer' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*.'"  *Id.* (quoting *Wright*, 479 U.S. at 432).

In 2006, the Fifth Circuit, following *Wright* and *Gonzaga*, held that Section 8 participants could bring suit under § 1983 to challenge the calculation of utility allowances by public housing agencies.  *Johnson*, 442 F.3d at 357–58.  The relevant statute at issue in *Johnson* provided that the amount of the participant's housing assistance was calculated as "the amount by which the rent (including the amount allowed for tenant-paid utilities) exceeds . . . 30 percent of the monthly adjusted income of the family."  *Id.* at 358 (quoting 42 U.S.C. § 1437f(o)(2)(A)(i)).[1]

---

[1] The complete text of §§ 1437f(o)(2)(A)–(B) provides:

    (2) Amount of monthly assistance payment

    Subject to the requirement under section 1437a(a)(3) of this title (relating to minimum rental amount), the monthly assistance payment for a family receiving assistance under this subsection shall be determined as follows:

        (A) Tenant-based assistance; rent not exceeding payment standard

        For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) does not exceed the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount

The "amount allowed for tenant-paid utilities" was determined by the PHA, which was directed by HUD regulations to base the utility allowance "on the typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type in the same locality . . . us[ing] normal patterns of consumption for the community as a whole and current utility rates." *Id.* (quoting 24 C.F.R. § 982.517(b)(1)).

The *Johnson* court concluded that the tenants could maintain a suit under § 1983 because the tenant-based Section 8 provision was "virtually identical" to the project-based provision at issue in *Wright*. *Id.* at 360. The court noted that the benefit provided by the statutory language of the voucher program was "undeniably direct. Its object is the 'monthly assistance payment for a family,' a tangible, government-funded benefit focused directly on the family." *Id.* at 363. It also noted that the statutory basis for private enforcement was stronger in the context of Section 8 claims than it was in *Wright*. Whereas § 1437a(a) made no explicit mention of the utility allowance, and provided only for "rent"—which was defined by HUD regulations—the Section 8 language "unmistakably provides—in the text of the act itself—for an amount to be allowed for tenant paid utilities." *Id.* The court noted that "[a]lthough the calculation and maintenance of

---

by which the rent (including the amount allowed for tenant-paid utilities) exceeds the greatest of the following amounts, rounded to the nearest dollar:

**(i)** 30 percent of the monthly adjusted income of the family.

**(ii)** 10 percent of the monthly income of the family.

**(iii)** If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the actual housing costs of the family, is specifically designated by that agency to meet the housing costs of the family, the portion of those payments that is so designated.

(B) Tenant-based assistance; rent exceeding payment standard

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) exceeds the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the applicable payment standard exceeds the greatest of amounts under clauses (i), (ii), and (iii) of subparagraph (A).

the utility allowance schedule may not be an exact science, courts surely are capable of at least reviewing the actions taken by public housing authorities to ensure that they have acted within their discretion." *Id.* at 364.

The Court is persuaded by the Fifth Circuit's reasoning in *Johnson* and holds that the same result is dictated with respect to Section 8's Homeownership Option.  The language of the Homeownership Option, § 1437f(y)(2), is nearly identical to the statutory language at issue in *Johnson*, § 1437f(o)(2).  The direct and mandatory language of the Homeownership Option creates a tangible, specific, and definite benefit, as it provides that the monthly assistance payment "*shall* be the amount by which the homeownership expenses exceed . . . 30 percent of the monthly adjusted income of the family."  42 U.S.C. § 1437f(y)(2)(A)(i) (emphasis added).  Although calculating the subsidy is no easy task, courts are capable of reviewing housing authorities' actions to ensure that they acted properly and within their discretion.  Accordingly, Plaintiff's claims under Counts IV, V, and VI are properly brought under 42 U.S.C. § 1983.

Plaintiff also claims in Counts IV, V, and VI that Defendants violated HUD regulations and provisions of the Administrative Plan adopted by HAPGC.  The Court is mindful that administrative regulations "cannot create an enforceable § 1983 interest not already implicit in the enforcing statute."  *Smith v. Kirk*, 821 F.2d 980, 984 (4th Cir. 1987); *see also Ritter v. Cecil Cnty. Office of Hous. and Comm. Dev.*, 33 F.3d 323, 327 n.3 (4th Cir. 1994) (citing *Wright*, 479 U.S. at 437–38 (O'Connor, J., dissenting)) ("Rights, created by regulation alone, if rights can be so created, probably cannot form the basis for a § 1983 action."); *Kissimmee River Valley Sportsman Ass'n v. City of Lakeland*, 250 F.3d 1324, 1327 (11th Cir. 2001) (holding that regulation which imposed new and distinct obligations not found in the statute itself was too far removed from congressional intent to constitute a federal right enforceable under § 1983).  To

the extent Plaintiff's claims are based on provisions in HUD regulations or the Administrative Plan that are not implicit in the rights-creating language of § 1437f(y), Plaintiff cannot pursue relief under § 1983.  Accordingly, Daniels will not be entitled to enforce those regulations or provisions that are not directly tied to the right she asserts in this case—a properly calculated housing subsidy.

However, where HUD regulations or Administrative Plan provisions define or flesh out the context of the right found in the statute itself, Plaintiff's § 1983 claims may be based on violations of such regulations and provisions.  *Id.*; *see also Wright*, 479 U.S. at 420 n.3, 430; *Baldwin v. Hous. Auth. of the City of Camden*, 278 F. Supp. 2d 365, 380–86 (D.N.J. 2003) (holding that plaintiff successfully stated a due process claim where housing authority denied her Section 8 benefits because she was not creditworthy, where creditworthiness was not a criterion for denial in the governing Administrative Plan).  Accordingly, the Court holds that Daniels has a right to enforce those provisions of the HUD regulations and Administrative Plan that define the housing authority's obligations and have a direct impact on the calculation of her monthly assistance payments.  With these principles in mind, the Court will analyze the extent to which it must defer to Defendants' administration of the Homeownership Option statute.

2.      Deference afforded to Defendants' actions

"The civil rights cause of action against a state agency implementing a federal program compels federal courts to uphold the letter of federal law while allowing agencies the discretion to perform their function of reasonably administering the federal program."  *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996).  The Fourth Circuit has held that it is appropriate for courts to show some deference to a local housing authority's interpretation of regulations under the Section 8 program.  *Ritter*, 33 F.3d at 327–28 (citations omitted).  The court has established a

22

two-step analysis for reviewing state agency interpretation of federal laws: "First, the court should determine whether the state agency action is inconsistent with the federal housing provisions. . . . If there is no inconsistency, the court should afford the state agency's action reasonable deference, meaning that the action should be upheld unless it is found to be arbitrary or capricious." *Clark*, 85 F.3d at 152 (citations omitted).  Once it is established that an agency's determination is not inconsistent with the relevant statute, "a court may not substitute its own interpretation for the agency's if the agency's interpretation is reasonable." *Ritter*, 33 F.3d at 328 (citing *Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984)).  "[T]he fact that an interpretation is not in the form of a promulgated rule will not prevent that interpretation from being afforded deference by courts if it is consistent with the federal provisions and is reasonable." *Clark*, 85 F.3d at 152.

As discussed in the Findings of Fact, Defendants held an informal hearing on Daniels's challenge to the calculation of her medical expenses.  The Fourth Circuit indicated that deference is due to the factfinding of a local housing authority where the agency holds a hearing that is "clearly judicial in nature in that it entails the presentation of evidence and a decision based thereon under specific legal standards." *Id.* at 151.  Informal hearings to address a Section 8 participant's challenge to the calculation of his or her subsidy are governed by 24 C.F.R. § 982.555.  Pursuant to that regulation, "[t]he person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision.  Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing." *Id.* § 982.555(e)(6).  The level of deference shown to the factfinding of an informal hearing officer "is not absolute but it is significant." *Clark*, 85 F.3d at 151.  "[T]o

23

insure compliance with federal law, the reviewing court must be satisfied that the hearing

officer's conclusions are supported by substantial evidence." *Id.* at 152.

3.      Analysis

Each of the Counts remaining in Plaintiff's Amended Complaint requires a detailed

analysis of Defendants' actions in light of pertinent HUD regulations and relevant provisions of

the governing Administrative Plan.  The Court will address Counts IV, V, and VI in turn.

a.      Count IV: Use of Akers's 2009 Income Tax Return

In Count IV, Daniels claims that Defendants' use of Akers's 2009 income tax return in

calculating her monthly assistance payments from August through December 2010 deprived her

of her federal right to a proper calculated subsidy.  In determining whether Defendants' decision

to use the tax return is to be afforded deference, the Court must first examine whether it was

inconsistent with § 1437f(y), implementing HUD regulations, or the Administrative Plan.

Second, if there was no inconsistency, the housing authority's action must be upheld unless it

was arbitrary or capricious.  *See Clark*, 85 F.3d at 152.

In calculating Daniels's annual household income for the purpose of determining her

monthly assistance payment, Section 6-I.C. of the Administrative Plan, following 24 C.F.R.

§ 5.609(a)(2), required HAPGC to count all income "anticipated to be received from a source

outside the family during the 12-month period following admission or annual reexamination

effective date."  Pl.'s Ex. 34.  In her testimony at trial, Floyd acknowledged that pursuant to the

Administrative Plan, a participant's current circumstances were "generally" used to determine

anticipated income for the coming 12 months.  However, the Plan explicitly authorized the use of

other than current circumstances to anticipate income when it was not feasible to anticipate

income over a 12-month period, or the housing authority believed that past income was the best

available indicator of future income.  *Id.*  Furthermore, the Plan provided that "[w]hen the PHA cannot readily anticipate income based upon current circumstances . . . , the PHA will review and analyze historical data for patterns of employment, paid benefits, and receipt of other income and use the results of this analysis to establish annual income." *Id.*  As a preliminary matter, there can be little question that Plaintiff has a right to enforce these regulations and Plan provisions given that they are directly tied to her asserted federal right—a properly calculated monthly assistance payment.  The Court concludes, however, that Defendants' use of Akers's 2009 income tax return was not inconsistent with the terms of the Administrative Plan or HUD regulations, and that Defendants' actions were not arbitrary or capricious.

In assessing Daniels's household income, Floyd reasonably believed that the tax return was the best and most reliable indicator of future income.  *See* Defs.' Ex. 9.  The only information Daniels and her attorney provided that evidenced her current circumstances was an undated projection of Akers's 2010 income from the family's accountant, a multitude of purported business expense receipts, many of which were illegible or in Daniels's name, and spreadsheets and proposed calculations that relied upon the submitted receipts.  *See* Pl.'s Exs. 8, 17–20.  Given this background, and given that Floyd knew Akers continued to be employed as a newspaper carrier, the same job he held in 2009, it was reasonable for Floyd to determine that Akers's 2009 income was, consistent with Section 6-I.C. of the Administrative Plan, the best and most reliable indicator of his 2010 income.

This conclusion is buttressed by reference to the Administrative Plan's verification hierarchy, which prioritized certain forms of family information over others.  Section 7-I.B. of the Plan provided that "[i]n general HUD requires the PHA to use the most reliable form of verification that is available . . . ."  Pl.'s Ex. 37.  According to both the Plan and the HUD

Verification Guidance, "Review of documents" was prioritized over "self-certification" or "Tenant Declaration," which was to be used only as a last resort. *Id.*; Defs.' Ex. 42 at 7-37–7-38. Under the HUD Verification Guidance on the verification of self-employment income, which was incorporated into Chapter 7 of the Administrative Plan, "[t]he PHA ***may*** accept any documents (i.e., ***tax returns***, invoices and letters from customers) provided by the tenant to verify self-employment income." *Id.* at 7-38 (emphasis added). With respect to self-certification or tenant declaration, a lower form of verification, the Guidance provided that "[t]he PHA ***may*** accept a notarized statements or affidavit from the tenant that declares the family's total annual income from self-employment." *Id.* (emphasis added). Plaintiff insists that Defendants were required to accept self-certification regarding her son's self-employment income. However, given that Floyd had a higher level of verification available—the 2009 tax return—it was reasonable for her to conclude, particularly in light of the permissive language in the HUD Verification Guidance, that reliance on the tax return was appropriate and that self-certification was unnecessary.

Defendants' conclusion that the 2009 tax return was the most reliable form of verification available finds additional support in the Plan's mandate that "[a]ny documents used for verification must be original (not photocopies) and generally ***must be dated*** within 60 calendar days of the date they are provided to the PHA." Pl.'s Ex. 37, § 7-I.B. (emphasis added). The LTS projection for Akers's 2010 income was undated. Therefore, Floyd properly determined that it did not meet the requirements for "Document Review" under the Plan, and could only be considered a form of self-certification. Section 7-I.B. further provided that any documents used for verification "***must*** not be damaged, altered or in any way ***illegible***." *Id.* (emphasis added). Floyd reasonably declined to rely on the business expense receipts submitted by Daniels and her

attorney in large part because many of them were illegible.  It was also reasonable for Floyd to conclude that some of Akers's purported business expense receipts were not reliable given that they were in Daniels's name or were otherwise not clearly related to Akers's business. Furthermore, it was reasonable for Defendants to disregard the spreadsheets and calculations submitted by Daniels's attorney.  Park's calculations directly relied on the receipts, which were of questionable quality and validity, and Park even admitted at trial that his methodology and calculations with respect to Akers's business income and expenses were faulty.

Plaintiff argues that Defendants violated the terms of Section 6-I.C. by failing to document a clear rationale in Daniels's file for departing from current circumstances and relying on the previous year's tax return.  Plaintiff is correct that Defendants did not comply with their Administrative Plan in this regard.  However, the Court holds that Plaintiff does not have a federal right to enforce this provision of the Administrative Plan, to the extent Plaintiff claims such a right.  Plaintiff is asserting in Count IV that Defendants deprived her of her federal right to a properly calculated subsidy.  The housing authority's obligations with respect to record-keeping of such decisions is a distinct obligation and not implicit from the rights-creating language of § 1437f(y).  The fact that Defendants failed to document a reason for departing from current circumstances does not implicate Plaintiff's asserted federal right.  Furthermore, there is no evidence that Defendants' noncompliance in this instance impacted the calculation of Daniels's subsidy.

Plaintiff also contends in Count IV (as well as Count VI) that Defendants violated her rights by failing to follow proper verification *procedures* required by HUD regulations and the Administrative Plan.  In particular, Plaintiff alleges that in several circumstances Defendants refused to accept self-certification from Plaintiff, and on other occasions failed to seek third-

party verification, which would have confirmed information submitted by the family.  The Court concludes, and Defendants have not disputed, that Plaintiff has the right to enforce the relevant verification provisions to the extent that they directly impacted the calculation of her monthly assistance payment.  The Homeownership Option, § 1437f(y), creates a federal right to a properly calculated subsidy based upon the participant's income.  Implicit in that rights-creating language is that the local housing authority must follow proper procedures and methods in verifying the participant's income.

Prior to analyzing the particular verification procedures at issue in Count IV (as well as Count VI), it is important to place the verification procedures in their proper context.  The Introduction to Chapter 7 of the Administrative Plan—titled Verification—unequivocally provided that "[t]he PHA *must* verify all information that is used to establish the family's eligibility and level of assistance and is *required* to obtain the family's consent to collect the information. . . . The PHA *must not* pass on the cost of verification to the family."  Pl.'s Ex. 36 (emphasis added).  These provisions were consistent with HUD regulations, which provided that the PHA "must obtain and document in the tenant file third party verification" of the family's annual income, expenses related to deductions, and other factors that affect the determination of adjusted income.  24 C.F.R. § 982.516(a)(2).  Daniels emphasizes, and the Court agrees, that the Plan imposed on Defendants an affirmative obligation to verify the information used in calculating her monthly assistance payments.

As a general matter, Defendants allege that Daniels failed to meet her own obligations insofar as she repeatedly failed to supply complete information in a timely fashion and then complained about Defendants' determinations after recertification or reexamination.  The Court need not determine whether Daniels failed to comply with her obligations under pertinent

regulations and the Administrative Plan.  However, in determining whether Defendants can be

held liable for noncompliance with verification procedures, the Court must remain cognizant that

Daniels had a concurrent responsibility to supply information that was accurate, complete, and

relevant to the calculation of her monthly assistance payments.  *See, e.g.*, Defs.' Ex. 6, § 15-

VII.H. ("***The family must supply*** information to the PHA or HUD as specified by 24 C.F.R.

§ 982.551(b).") (emphasis added); 24 C.F.R. § 982.551(b)(2) ("***The family must supply*** any

information required by the PHA or HUD for use in a regularly scheduled reexamination or

interim reexamination . . . .") (emphasis added); *Id.* § 982.551(b)(4) ("Any information ***supplied***

***by the family*** must be true and complete.") (emphasis added); Defs.' Ex. 42, HUD Verification

Guidance at 7-38 (stating that PHA will contact sources "identified ***by the family***") (emphasis

added); Pl.'s Ex. 36, § 7-I.A. ("***The family must supply*** any information that the PHA or HUD

determines is necessary to the administration of the program . . . .") (emphasis added).

Furthermore, many of Plaintiff's allegations concern Defendants' alleged failure to seek

third party verification, which is prioritized over the review of family documents in the HUD

verification hierarchy and Administrative Plan.  Pl.'s Ex. 37 § 7-I.B.; Defs.' Ex. 42, HUD

Verification Guidance at 7-37–7-38.  The Court is cognizant that although HUD regulations and

the Plan generally imposed an affirmative obligation on Defendants to seek third party

verification and rely on the highest form of verification, the Plan also granted Defendants some

discretion to determine whether such verification was required or available.  *See, e.g.*, Pl.'s Ex.

37, § 7-I.B ("HUD requires the PHA to use the most reliable form of verification ***that is***

***available*** . . . .") (emphasis added); Defs.' Ex. 25, § 7-I.E. ("If the ***PHA has determined*** that

third-party verification ***is not available or not required***, the PHA ***will use*** documents provided

by the family as verification.") (emphasis added).  Therefore, in light of all these provisions,

Defendants' actions must be assessed in light of the quality of the information supplied by Daniels and whether verification was available or required under the circumstances.

Focusing on Defendants' liability on Count IV, Plaintiff first contends that Defendants did not properly verify Akers's self-employment income.  The HUD Verification Guidance provided that "[t]he PHA mails or faxes a verification form directly to sources identified by the family to obtain income information," or that "[t]he PHA may call the source to obtain income information."  Defs.' Ex. 42 at 7-38.  Plaintiff argues that Defendants could have and should have contacted the sources of Akers's income pursuant to the HUD verification hierarchy, particularly given that Akers consented to the release of information to HAPGC.  *See* Pl.'s Ex. 10.

The problem with Plaintiff's argument is that there was no material dispute with respect to Akers's *gross income*, and therefore, verification of that information was not required under the circumstances.  Indeed, the 2009 tax return and 2010 LTS projection indicated that Akers's gross income was largely unchanged between 2009 and 2010.  *Compare* Defs.' Ex. 9 at 929 ($37,986 for 2009) *with* Pl.'s Ex. 8 ($35,592 projected for 2010).  Accordingly, there was no need for Floyd to contact the sources of Akers's income to verify his gross income.[2]  The primary discrepancy between the 2009 return and the 2010 projection was based upon Akers's *business expenses* and the resulting net income (or adjusted gross income).  *Compare* Defs.' Ex. 9 at 922 ($20,365 adjusted gross income for 2009) *with* Pl.'s Ex. 8 ($9,492 projected net income for 2010).  It appears to the Court that the only individuals with knowledge of Akers's purported business expenses were Akers and Daniels, and there is no indication from the record that they identified additional sources of information relating to his business expenses.  In this case, it was

---

[2] Furthermore, the factual record in this case does not support a conclusion that Akers even identified these sources of income to Defendants.  HAPGC only would have been required to contact such sources that are "identified by the family."  Defs.' Ex. 42, HUD Verification Guidance at 7-38.

reasonable for Floyd to conclude that third-party verification of Akers's gross income was not required and that third party verification of his business expenses was not available, particularly given the questionable quality, accuracy, and relevance of the information provided by Daniels and her attorney.  Accordingly, Defendants' determination was not inconsistent with HUD regulations or Plan provisions and was not arbitrary or capricious.

In her post-trial brief, Plaintiff cites Section 7-III.B. of the Plan, which also concerns verification of self-employment income.  *See* Doc. No. 54 at 13.  She argues that Defendants violated the requirement that "[t]he PHA will provide a format for any person who is unable to provide such a statement to record income and expenses for the coming year."  Pl.'s Ex. 39. However, Akers, Daniels, and her attorney did provide statements and documentation regarding income and expenses for the coming year; Floyd simply determined that they were not as reliable as the 2009 tax return.  Floyd's conclusion that Defendants did not have to provide a format to Akers was reasonable under these circumstances, and not inconsistent with Section 7-III.B. Furthermore, Plaintiff has not demonstrated that Akers's receipt of a format from Defendants would have had any impact on the calculation of her subsidy given that the 2009 tax return constituted a higher level of verification than self-certification.

Plaintiff also emphasizes mandatory language in the HUD Verification Guidance which stated that "[w]hen third party verification is not available, the PHA ***should always*** request a notarized tenant declaration that includes a perjury statement."  Defs. Ex. 42 at 7-38 (emphasis added).  Floyd testified that despite third party verification being unavailable, she did not request such a declaration from Daniels or Akers with respect to his self-employment income.  However, even if Floyd had obtained a tenant declaration, the 2009 tax return would still have constituted a higher level of verification, and under the HUD Verification Guidance and Administrative Plan,

Defendants would have been required to rely on the tax return over the tenant declaration. Indeed, the HUD Verification Guidance provided that self-certification was to be used only as a last resort.  While Defendants' may have technically failed to comply with this portion of the HUD Verification Guidance, Plaintiff has not established that the calculation of her subsidy was affected or impacted by this instance of noncompliance. In these circumstances, Defendants cannot be held liable under § 1983 for their failure to request self-certification.

To summarize, the Court concludes that Defendants' use of Akers's 2009 income tax return was not inconsistent with HUD regulations or the Administrative Plan.  Furthermore, Defendants' actions with respect to calculation and verification were not arbitrary or capricious, as they were rooted in the requirements of the governing regulations and Plan provisions. Accordingly, Defendants' determinations must be afforded deference, and the Court finds in Defendants' favor on Count IV.

> b.    Count V: Inclusion of Akers's Income in December 2010 Subsidy

In Count V, Plaintiff claims that Defendants' failure to exclude Akers's income from the calculation of her December 2010 housing subsidy deprived her of her federal right to a proper calculated subsidy.  As a preliminary matter, because household composition is an integral component of calculating a Section 8 participant's subsidy, the Court holds that Daniels has an enforceable interest in the HUD regulations and Plan provisions governing household composition.  The Court concludes, however, that Defendants' actions were not inconsistent with pertinent regulations and Plan provisions and were not arbitrary or capricious.

On November 30, 2010, Park e-mailed Floyd and attached affidavits stating that Akers had left the household.  *See* Pl.'s Ex. 22.  Three days later, Floyd responded to this e-mail by informing Daniels that the affidavits were not sufficient and that Defendants could not process

her request for a change in household composition because they needed legal proof of Akers's

new residence—i.e., new picture identification, a utility bill, banking statement, or change of

address card.  Pl.'s Ex. 12.  On December 15, 2010, Park submitted a copy of Akers's new

identification card and change-of-address letter from USPS, both of which evidenced his new

Washington, D.C. address.  Pl.'s Ex. 13.  Upon receipt of this information, Defendants

immediately effectuated the change in Daniels's household composition beginning in January

2011.  *See* Pl.'s Ex. 14.  Floyd's determination was not inconsistent with Section 7-II.D. of the

Administrative Plan, which provided the following:

> If an adult family member who was formerly a member of the household is
> reported to be permanently absent, the family must provide evidence to support
> that the person is no longer a member of the family (e.g., ***documentation of
> another address at which the person resides such as a lease or utility bill***).  A
> written statement from HOH and adult member ***may be required***.

Defs.' Ex. 14 (emphasis added).  It was reasonable for Defendants to reject the affidavits given

that the Plan favored other forms of documentation and merely provided that an affidavit (or

written statement) *may* be required by the PHA.

Plaintiff emphasizes that Park notified Floyd in writing on November 18 that he would be

providing affidavits, *see* Pl.'s Ex. 17, and that it was Defendants' obligation to inform Daniels

that the affidavits would not be accepted and that other documentation would be required.

Plaintiff cites Section 11-II.D., which provided that "[b]ased on the type of change reported, the

PHA will determine the documentation the family will be required to submit.  That family must

submit any required information or documents within 10 business days of receiving a request

from the PHA."  Defs.' Ex. 15.  The Court acknowledges that Defendants' communication with

Daniels could have been more effective.  Furthermore, Defendants could have provided Daniels

and her attorney with a copy of the Administrative Plan earlier than they did.  However, there is

no evidence that Floyd deceived Daniels or her attorney, failed to answer specific questions posed to her, or otherwise acted in an arbitrary or capricious manner. Furthermore, Section 11-II.D. cannot be read as imposing liability on the local housing authority for failing to correct any potential mistaken assumptions a participant may have with respect to verification documents. Such a reading contradicts Section 6-I.B. of the Plan, which imposed the responsibility for reporting changes in household composition on the head of the family. *See* Pl.'s Ex. 42; *See also supra* Part III.A.3.a (listing provisions that place responsibility on Section 8 participants to supply information).

Plaintiff next submits that Defendants should have accepted the affidavits because they were sufficient documentation under the verification hierarchy of the Administrative Plan. However, the verification hierarchy cited by Plaintiff concerned verification of income information, not changes in household composition. Floyd relied on the language of Section 7-II.D., which specifically addressed verification of changes in household composition and favored documents evidencing change of residency over affidavits. Defendants' interpretation of the relevant Plan provisions was reasonable, and the Court will not substitute a different interpretation. *See Ritter*, 33 F.3d at 328.

Accordingly, the Court holds that Defendants' exclusion of Akers from the household effective January 2011, rather than December 2010, was not inconsistent with HUD regulations or the Administrative Plan, and Defendants' actions were not arbitrary or capricious. Defendants' determinations are entitled to deference, and the Court therefore finds in Defendants' favor on Count V.

c.      Count VI: Calculation of Medical Expenses

In Count VI, Plaintiff claims that Defendants' failure to account for all her medical expenses deprived her of her federal right to a proper calculated subsidy.  The Court holds that Plaintiff has the right to enforce the HUD regulations and Administrative Plan provisions concerning the calculation of her medical expenses.  Such regulations and provisions are directly tied to her asserted federal right—a properly calculated monthly assistance payment.  And for the same reasons discussed with respect to Count IV, Plaintiff also has a right to enforce those HUD regulations and Plan provisions that directly impacted the calculation of her subsidy.

Plaintiff's primary complaint with Defendants' calculations of her medical expenses is that they used a backward-looking approach, accounting only for past medical expenses, and failed to anticipate, account for and verify expenses that Daniels was likely to incur to the future. As part of determining a participant's monthly assistance payment, Section 6-II.A. of the Administrative Plan outlined the methodology for calculating medical expenses:

> Generally, the PHA will use current circumstances to anticipate expenses.  When possible, for costs that are expected to fluctuate during the year (e.g., child care during school and non-school periods and cyclical medical expenses), the PHA will estimate costs based on historic data and known future costs.  If the family has an accumulated debt for medical . . . expenses, the PHA will include as an eligible expense the portion of the debt that the family expects to pay during the period for which the income determination is being made.  However, amounts previously deducted will not be allowed even if the amounts were not paid as expected in a preceding period.  The PHA may require the family to provide documentation of payments made in the preceding year.

Pl.'s Ex. 43.

The procedures applicable to verifying income, discussed *supra* Part III.A.3.a, also applied to the verification of other family information, including medical expenses.  *See* Pl.'s Ex. 37 §§ 7-I.B, 7-I.E, 7-I.F.  With respect to medical expenses in particular, Section 7-IV.B. provided:

The PHA may provide a form directly to the medical provider requesting the needed information.

Medical expenses will be verified through:

> Verification form signed by the provider, when possible
>
> Copies of cancelled checks used to make medical expense payments and/or printouts of receipts from the source will be used.  In this case the PHA will make a best effort to determine what expenses from the past are likely to continue to occur in the future.  The PHA will also accept evidence of monthly payments or total payments that will be due for medical expenses during the upcoming 12 months.

Defs.' Ex. 28.  Defendants were also required to verify that the costs to be deducted were qualified medical expenses and that the costs incurred in past years were counted only once.  *Id.*

For Plaintiff's annual recertification in August 2011, Defendants accounted for paid medical expenses for services by Dr. Cohen ($270) as well as the remaining $100 balance on the same account, as reflected by documents Daniels submitted on April 27, 2011.  *See* Pl.'s Ex. 16; *see also* Pl.'s Ex. 44 at 1097.  However, Defendants did not give Daniels additional credit for the remaining documents she submitted in April 2011, which included an Estimated Treatment Plan from Dr. Cohen and Financial Options documents from Drs. Burk and Flinn.

Based on the information available at the time of the annual recertification, Floyd reasonably determined that Daniels's medical expenses were cyclical; she therefore accounted for historic data (the $270 in paid expenses) and known future costs (the $100 balance) to anticipate Daniels's expenses for the coming year.  *See* Pl.'s Ex. 43, § 6-II.A.  However, it was not clear from the Estimated Treatment Plan that Daniels would be incurring additional expenses from Dr. Cohen throughout the year.  *Id.*  It was similarly not apparent from the face of the Financial Options document that Daniels would be incurring future medical expenses from Drs.

Burk and Flinn.[3]  Aside from the Cohen statement, Daniels supplied no evidence of historic data

or known future costs in April 2011.  Therefore, the Court cannot conclude that Defendants'

determinations, which were made effective August 2011, were inconsistent with the

Administrative Plan.

　　　　Plaintiff also asserts that Defendants failed to comply with their obligations to obtain

third-party verification of Daniels's medical expenses after she submitted documents in April

2011.  Section 7-IV.B. of the Plan, which specifically addressed verification of medical expense

deductions, began by stating that "[t]he PHA *may* provide a form directly to the medical provider

requesting the *needed* information."  Defs.' Ex. 28 (emphasis added).  First, this language is

permissive in its terms, and the Court cannot conclude that liability automatically lies against

Defendants based on their decision not to contact Daniels's medical providers.  Certainly, it also

would have been a reasonable interpretation of Section 7-IV.B. for Defendants to seek third-

party verification, but the Court will not substitute such an interpretation where the Defendants'

action was reasonable and not contrary to the governing provisions.  Second, a reasonable person

in Floyd's position would not necessarily have reviewed the Estimated Treatment Plan and

Financial Options documents and inferred that Plaintiff had undertaken any obligation to pay

future medical expenses.  Accordingly, after accounting for the historic data and known future

expenses, there was no additional, relevant information that Defendants *needed* for verification

purposes.  Furthermore, Daniels had an obligation to provide complete and relevant information

to the housing authority prior to her annual recertification, and Defendants reasonably relied on

the information she submitted and determined that no further verification was required.  In light

---

[3] Daniels also provided a letter from Dr. Mehta dated May 4, 2011, which described her medical condition and stated that she was currently receiving treatment.  *See* Pl.'s Ex. 15.  It is not clear from the record when this document was provided to Defendants.  Regardless, as with the Estimated Treatment Plan and Financial Options documents, the Mehta letter did not clearly indicate that Daniels had undertaken an obligation to pay future medical expenses.

of these circumstances, Defendants' actions in the August 2011 recertification were not inconsistent with pertinent regulations or Plan provisions, and were not arbitrary or capricious.[4]

Weeks after her annual recertification, in October 2011, Daniels and her attorney provided Defendants with more extensive information regarding her medical expenses. Park informed Floyd via e-mail that Daniels was incurring ongoing expenses for treatment with Dr. Cohen as well as ongoing financial obligations with Care Credit based on treatment by Drs. Burk and Flinn. *See* Pl.'s Exs. 23–24.

The Court will first assess Defendants' determinations regarding the Care Credit documentation. Floyd gave Daniels credit—effective November 2011—for $845 in past payments made on her Care Credit account. *See* Pl.'s Ex. 44 at 1088. Defendants declined to give Daniels credit for the remaining balance on her Care Credit statement, however. Plaintiff contends that Defendants' refusal to give Daniels credit for her accumulated medical debt was inconsistent with Section 6-II.A. of the Administrative Plan. The Court disagrees. Floyd testified that Defendants were aware that Care Credit was used exclusively for medical purposes,

---

[4] Although Plaintiff claims that her subsidy should have increased effective May 2011, she has not demonstrated, through citations to relevant Plan provisions, HUD regulations, or otherwise, that she was entitled to an immediate adjustment effective May 2011. Plaintiff has also failed to demonstrate that it was improper for Defendants to make the adjustment effective in August 2011, the date of her annual recertification. HUD regulations mandated annual reexaminations by the local housing authority. 24 C.F.R. § 982.516(a). However, with respect to interim reexaminations, the relevant regulation contained permissive language and granted broad discretion to the local housing authority:

(b) When PHA conducts interim reexamination.

(1) At any time, the PHA *may* conduct an interim reexamination of family income and composition.

(2) At any time, the family may request an interim determination of family income or composition because of any changes since the last determination. The PHA must make the interim determination *within a reasonable time* after the family request.

*Id.* § 982.516(b)(1)–(2) (emphasis added). In this case, Daniels has not demonstrated that she requested an interim reexamination when she submitted medical documentation in April 2011. Even if she did request such a reexamination, Plaintiff did not argue and the Court cannot conclude that the reexamination, which occurred in August, followed an unreasonable delay.

but it was not clear from the face of the documents provided by Park that the remaining balance was based on *allowable* deductions.  For example, the Care Credit statement contained interest charges, which are not deductible medical expenses under the terms of the Plan.  The User Guide provided by Daniels's attorney also stated that the Care Credit card could be used for any family member (including those not in the household) as well as pets.  Pl.'s Ex. 24 at 1547.  Such medical expenses would not be deductible under HUD regulations or the Administrative Plan. Accordingly, based on the Care Credit statement, Floyd could not accurately project what Daniels's properly deductible future medical expenses were going to be.  As with the Estimated Treatment Plan and Financial Options documents received in April 2011, Floyd only had clear evidence of cyclical medical expenses, and she properly accounted for Daniels's historic costs by crediting her with an additional $845 in medical expenses, in addition to the $370 for which she had already received credit.  *See* Pl.'s Ex. 44 at 1088 (total medical expenses of $1,215 effective November 2011).  Accordingly, Defendants' determination with respect to the Care Credit documents was not inconsistent with the Plan and was not arbitrary or capricious.

Likewise, Defendants did not act contrary to the Plan's verification provisions.  It again bears emphasis that Section 7-IV.B was permissive in its terms, and liability does not lie simply because Defendants chose not to contact Daniels's medical providers.  Furthermore, it was Plaintiff's obligation to provide complete, accurate, and relevant information, and Defendants' actions with respect to verification must be assessed in light of the quality of the information available to them at the time they determined Daniels's subsidy.   Based on the information submitted, Floyd could not make the determination that Daniels had incurred future, *deductible* medical expenses.  Accordingly, once historic costs were accounted for, it was reasonable for Defendants to conclude that no further verification was necessary or required.  Furthermore,

Section 7-IV.B required that medical expenses may be verified through medical expense payments and/or receipts, and that in such a case, the PHA will make a best effort to determine which past expenses are likely to continue in the future. Defs.' Ex. 28. Floyd carefully examined the documents submitted as well as Plaintiff's representations (through Park) that she was incurring ongoing expenses, and determined that Plaintiff had failed to demonstrate that she would be incurring ongoing, *deductible* medical expenses. The Court cannot conclude that Floyd's verification effort was inconsistent with the Plan's mandate, nor can it conclude that Defendants acted in an arbitrary or capricious manner.[5]

The Court reaches a different conclusion regarding the remaining documents submitted in October 2011, which reflected past payments to Dr. Cohen as well as an outstanding balance. Floyd testified that she had already given credit for paid expenses to Dr. Cohen when Daniels provided documentation in April 2011. However, a review of the pertinent documents reveals that Defendants did not give Daniels credit for all her incurred expenses. Park's October 19 e-mail and the attached documents showed that Daniels had paid Cohen $445 since March 2011, including a $50 payment on June 9 and a $25 payment on September 7. *See* Pl.'s Exs. 23–24. Floyd had only given Daniels credit for $370 effective August 2011, and never accounted for the additional $75 in payments. It was a clear violation of the Section 6-II.A of the Administrative

---

[5] Plaintiff also asserts in her post-trial memorandum that Defendants were required to make two unsuccessful attempts to obtain third-party verification prior to relying on other documents. *See* Doc. No. 54 at 15. The portion of the Administrative Plan cited by Plaintiff, page 7-6 in Section 7-I.D., was not presented as an exhibit at trial. However, this provision was attached to Plaintiff's Motion for Partial Summary Judgment. *See* Doc. No. 28-5 at 7-6. The complete language of Section 7-I.D. provided that "*[u]nless third-party verification is not required* . . . , HUD requires the PHA to make at least two unsuccessful attempts to obtain third-party verification before using another form of verification." *Id.* (emphasis added). As discussed *supra*, Section 7-I.E. of the Plan provided that "*[i]f the PHA has determined* that third-party verification is not available or *not required*, the PHA *will use documents provided by the family* as verification." Defs.' Ex. 25 (emphasis added). Given the circumstances, it was not inconsistent with the Plan for Defendants to conclude that additional verification was not required and to rely on the documentation provided by Daniels and her attorney.

Plan, as well as HAPGC's practices and policies, for Defendants not to account for this historic data in calculating Daniels's medical expenses effective November 2011.

A hearing was held to address Daniels's challenge to Defendants' calculation of her medical expenses on April 3, 2012.  On April 16, 2012, Defendants affirmed their decision with respect to the determinations of Daniels's subsidy that were made effective August 2011 and November 2011.  Defs.' Ex. 41.  However, in calculating Daniels's subsidy effective May 2012, Defendants finally accounted for the $75 in payments to Dr. Cohen dated June 9 and September 7, 2011.  *Id.*  The notice of decision included the following finding with respect to these expenses:

> It is the client's responsibility to provide the PHA with the verification necessary to determine the correct calculations.  The new information that was presented at the informal hearing on April 3, 2012 was not available at the time the calculations were performed and therefore cannot be used to contest the accuracy of those prior calculations.  Further, no retroactive adjustments will be processed. The PHA policy referring to this is located in the PHA Administrative Plan, Page 11-12, 11-II.D. Processing and Interim Reexamination.

*Id.*

Although the level of deference afforded to a hearing officer is significant, the Court will not defer to the hearing officer's findings of fact unless they are supported by substantial evidence.  *See Clark*, 85 F.3d at 151–52.  In this case, the hearing officer's findings not only lacked substantial evidence, but they were clearly erroneous.  Documentation of the $75 in payments to Dr. Cohen was clearly provided by Park and available to Defendants in October 2011, not March or April 2012.  Therefore, Defendants should have adjusted Daniels's subsidy effective November 2011 to account for the $75 in paid expenses.  Such an adjustment would have been consistent with Section 11-II.D. of the Administrative Plan, which provides that if the family's share of housing payments is to decrease as a result of reexamination, "[t]he decrease

will be effective on the first day of the month following the month in which the change was reported and all required documentation was submitted." Defs.' Ex. 15.  Accordingly, Defendants are liable on Count VI for failing to give Daniels credit for $75 in medical expenses from November 2011 through April 2012.

Daniels's attorney also submitted documentation in October 2011 demonstrating that she had a $91 balance with Dr. Cohen, and as with the past payments of $75, Defendants are liable for failing to give Daniels credit for this balance.  Park's October 19 e-mail and the attached statements from Dr. Cohen unequivocally identified this balance, and the document clearly reflected an ongoing obligation to pay deductible medical expenses.  *See* Pl.'s Exs. 23–24. Effective August 2011, Floyd gave Daniels credit for a similar outstanding balance of $100.  *See supra*; Pl.'s Ex. 16.  It was therefore HAPGC's practice and policy to give credit based on documents which clearly demonstrated an outstanding balance for deductible medical expenses. Such a balance constituted a known future cost within the meaning of Section 6-II.A. Defendants' liability must be limited, however, to the six-month period from November 2011 through April 2012, because effective May 2012, Defendants began crediting Daniels with an additional $100 based on payments to Dr. Cohen on March 12, 2012 and April 2, 2012.  Defs.' Ex. 41.  Pursuant to Section 7-IV.B., past medical costs could only be counted once, so Daniels cannot be given credit for the $91 balance beyond April 2012.  *See* Defs.' Ex. 28.

The Court therefore concludes that Defendants are liable on Count VI for failing to properly give Daniels credit for $166 in medical expenses for the six months between November 2011 and April 2012.  Based upon the statutory formula, the Court concludes that Plaintiff

should have received an additional \$4.00/month for this period.[6] Plaintiff is therefore entitled to economic damages of \$24.00.[7]

Damages for emotional distress are compensable under § 1983. However, such damages are not presumed from every denial of a federal right, "but must be proven by competent, sufficient evidence." *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996). "The emotional distress . . . must find its genesis in the actual violation, not in any procedural deficiencies that accompanied the violation . . . , because damages for violations of civil rights are intended to compensate injuries caused by the . . . deprivation." *Id.* (citations omitted) (internal quotation marks omitted). At trial, Plaintiff testified that she suffered stress, sleepless nights, headaches, and general mental anguish because Defendants did not provide her a proper subsidy. Specifically, Plaintiff suffered anxiety because she did not have adequate money to provide for her family and she had to ask family members for financial assistance. Daniels also testified that the denial of a proper subsidy caused stress on her family members and strained her family relationships.

Plaintiff has failed to demonstrate by a preponderance of the evidence that she is entitled to emotional distress damages based on Defendants' failures to account for all her medical

---

[6] The damages are based upon a review of Defendants' worksheets reflecting Plaintiff's subsidy calculations during these months. *See* Pl.'s Ex. 44 at 1088, 1628, 1630, 1636, and 1638. For example, effective February 1, 2012, Defendants credited Daniels with \$972 in medical deductions. *Id.* at 1638. However, she should have been credited with \$1,138 in deductions (\$972 + \$166). Using the \$1,138 amount, her adjusted annual income was \$6,070, and 30% of the adjusted income was \$152/month. As a result, Plaintiff should have received a subsidy of \$1,639, not \$1,635. The Court's recalculations for each month from November 2011 through April 2012 result in the same \$4.00 shortfall.

[7] Plaintiff's post-trial briefings claim that she is entitled to damages for subsidy miscalculations up to and including the year 2013. *See* Doc. No. 55 ¶¶ 24, 31. Plaintiff failed to demonstrate at trial how Defendants miscalculated her subsidy or how she suffered any damages beyond April 2012. For example, testimony was provided and evidence presented that in Daniels's most recent certification dated November 15, 2012 and made effective January 2013, she was credited with \$530 in medical expenses. *See* Pl.'s Ex. 44 at 1608–11. However, Daniels's medical deduction was determined to be zero because three percent of gross family income is not deductible, and that figure exceeded Daniels's medical expenses. Plaintiff has presented no evidence that directly challenged Defendants' most recent calculations of her medical expenses and resulting subsidy. Therefore, Defendants' liability and Plaintiff's damages are limited to the period from November 2011 through April 2012.

expenses.  As discussed above, Defendants deprived Daniels of a federal right to a properly

calculated subsidy by failing to account for all her medical expenses during a six-month period,

resulting in economic damages of $24.00.  The Court cannot conclude based on Daniels's

testimony that her emotional distress and anxiety was caused by the deprivation in this case,

which was minimal compared to what Daniels was claiming at trial.[8]  Although Defendants'

miscalculation resulted in a slight underpayment for a six-month period, Defendants frequently

engaged in communications with Daniels and her attorney regarding the calculation of her

medical expenses, recalculated her subsidy on an interim basis on multiple occasions, and did not

demonstrate any hostility toward Daniels.  Furthermore, Plaintiff may not be compensated for

stress suffered by her family members, and her contention that her family relationships suffered

is too speculative for the Court to award noneconomic damages.

For the foregoing reasons, the Court holds that Defendants violated Plaintiff's federal

right to a properly calculated housing subsidy when they failed to properly account for all her

medical expenses from November 2011 through April 2012.  Plaintiff will enter judgment

against Defendants on Count VI and award Plaintiff $24.00 in damages.

B.      Damages based upon deprivation of procedural due process rights (Count I)

As discussed above, the Court already concluded prior to trial that Defendants violated

Plaintiff's Fourteenth Amendment due process rights by failing to hold a hearing so that she

could contest HAPGC's determinations with respect to Akers's income and her household

composition.  Plaintiff's Amended Complaint alleged on all counts, including Count I, that

Daniels suffered economic hardship and emotional distress as a result of struggling to meet her

homeownership expenses without the proper amount of her subsidy.  *See* Doc. No. 24.

---

[8] According to her Amended Proposed Findings of Fact and Conclusions of Law, Plaintiff was claiming economic damages of $4,221.30 between May 2011 and March 2013 as a result of Defendants' alleged failures to properly calculate her medical deduction.  Doc. No. 55 ¶ 31.

Plaintiff's damages claim on Count I appears limited to emotional distress damages, as she presented no evidence or testimony that she suffered economic damages as a result of Defendants' failure to provide her with a hearing.  As discussed above in the Court's analysis of Count VI, Daniels testified that she suffered stress, sleepless nights, headaches, and mental anguish because Defendants allegedly failed to provide her with her correct subsidy amount. "Damages under § 1983 are intended to compensate for actual injuries caused by constitutional violations; therefore, a § 1983 plaintiff alleging emotional distress must demonstrate that the emotional duress resulted from the constitutional violation itself." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (citing *Carey v. Piphus*, 435 U.S. 247, 263 (1978)). "The plaintiff must adduce sufficient evidence 'that such distress did in fact occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes.'" *Knussman*, 272 F.3d at 639–40 (quoting *Price*, 93 F.3d at 1250).  Plaintiff failed to present *any* testimony or evidence that she suffered emotional distress or mental anguish as a direct result of Defendants' having denied her a hearing.  The Court will therefore award Plaintiff $1.00 in nominal damages based on Defendants' violation of her due process rights.

## IV.      CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants on Counts IV and V.  The Court will enter judgment in favor of Plaintiff on Count VI and award her $24.00 in damages.  The Court will award nominal damages of $1.00 to Plaintiff on Count I.  A separate Order and Judgment follows.


    April 17, 2013                                     /s/
        Date                              Alexander Williams, Jr.
                                          United States District Judge

45